JEANETTE WALKER                          CIVIL ACTION

VERSUS                                   NUMBER: 08-3666

MICHAEL J. ASTRUE,                       SECTION: "B"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits. (Rec. docs. 12, 14).

Jeanette Walker, plaintiff herein, filed the subject application for SSI benefits on February 3, 2004, with a protective filing date of January 22, 2004, alleging disability as of December 10, 2003. (Tr. pp. 104-106, 103). In a Disability Report completed

on February 2, 2004, plaintiff identified depression and arthritis as the conditions resulting in her inability to work. (Tr. pp. 108-117).  Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on March 4, 2004. (Tr. pp. 46-49).  Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on January 19, 2006 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 52-53, 356-376).  The case was subsequently reallotted to a different ALJ who, on April 21, 2006, issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 32-41).  On plaintiff's request for review of the ALJ's decision, on July 7, 2006, the Appeals Council ("AC") remanded the matter back to the ALJ for further proceedings. (Tr. pp. 42-45).

Following the remand, plaintiff's case was reallotted to yet another ALJ who convened a second hearing on December 20, 2006 at which plaintiff again testified. (Tr. pp. 377-405).  That hearing was continued to allow time for the receipt of additional medical records. (Id.).  The hearing was ultimately resumed on November 15, 2007 with plaintiff and a second VE providing additional testimony. (Tr. pp. 406-435).  On December 14, 2007, the ALJ issued a written decision in which he concluded that plaintiff was not disabled

2

within the meaning of the Social Security Act. (Tr. pp. 13-15). The AC subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 5-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.      The ALJ violated 20 CFR 416.1477 by failing to comply with the remand instructions issued by the Appeals Council.

II.     The ALJ failed to find that claimant meets or at very least equals Listing 1.04.

(Rec. docs. 12-6, p. 5).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.      [t]he claimant has not engaged in substantial gainful activity since February 3, 2004, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.      [t]he claimant has the following severe impairments: Degenerative Disc Disease of the Lumbar Spine; Degenerative Joint Disease (20 CFR 416.920(c)).

3.      [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 10 pounds

frequently, 20 pounds occasionally; to stand and walk for two to three hours out of an eight hour work day at half hour increments; to sit for six hours out of an eight hour day; to push and pull within the limits of lifting and carrying; to engage in a full range of postural movements occasionally, with the exception of never climbing ropes, ladders or scaffolds; to manipulate, see and communicate without restriction and to work within any environment with the exception of working around hazardous machinery or at unprotected heights.

5. [t]he claimant is unable to perform any past relevant work (20 CFR 416.965).

6. [t]he claimant was born on February 21, 1957 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10. [t]he claimant has not been under a disability, as defined in the Social Security Act, since February 3, 2004, the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 18, 19, 23, 24).

Judicial review of the Commissioner's decision to deny SSI

benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act.

Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

6

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the claimant carries that burden and successfully demonstrates that she is unable to perform the work that she has done in the past, the burden of proof shifts to the Commissioner at the fifth step to show that the claimant can perform other work in light of her age, education, work experience, and physical and mental limitations. Kramer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). The ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the first administrative hearing that was held on January 19, 2006, plaintiff was forty-eight years of age, had obtained a GED, and had past relevant work experience as a substitute teacher, housecleaner, and shuttle bus driver. Plaintiff lived with her mother, who was blind, and her two

daughters, ages fourteen and eighteen, the latter of whom plaintiff testified had recently begun working although the ALJ would later report that the daughter received Social Security benefits.

In terms of daily activities, plaintiff testified that she rose in the morning and had coffee, laid around until lunch, performed a few light household chores, sat on the heating paid, watched TV, prepared dinner in the microwave, and then home-schooled her younger daughter in the evening hours. Plaintiff then inconsistently testified that she performed no chores and did no laundry or cooking, then added that dinner was prepared in the microwave and that her children helped her with chores. She had a car and could drive. Plaintiff estimated that she could sit and stand for twenty to thirty minutes at a time, could walk for half a block but would then experience pain, and could lift only two pounds. Medications at the time included Mobic which helped with arthritis to the elbows and wrist but which left her dizzy and sick to her stomach; Soma for muscle spasms and as a sleeping aid at night; and, Lortab which reduced her pain and allowed her to do some light chores at night. Plaintiff saw her doctor once per month who provided her medication refills. Plaintiff testified that she had gained forty pounds in the previous six months and now weighed one hundred eighty pounds. (Tr. pp. 360-371).

Upon being questioned by her attorney, plaintiff testified to

experiencing pain in the low back for the previous five years which had worsened in the previous two years. The lower back pain was described as a constant, dull ache even after taking prescribed medication and it sometimes felt like her spine might split apart. Knee pain attributable to arthritis was continuous. Plaintiff testified that her doctor had diagnosed her with a degenerative disc and arthritis in the knees and elbows. Her ankles, feet, and fingers hurt as well and pain was increased with standing and walking. She had also suffered from a hernia. (Tr. pp. 371-374).

Patricia Knight, a VE was next to take the stand. Knight first classified plaintiff's past work as a teacher's aide as light, semi-skilled; her past work as a housecleaner as light to medium and unskilled; and, her past work as a shuttle bus driver as medium, semi-skilled. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who could lift twenty pounds occasionally, ten pounds frequently; could stand and/or walk for six hours per eight-hour workday; could sit for less than six hours per eight-hour workday; and, who had some occasional difficulties in kneeling and crawling because of a right knee problem. With those capabilities in mind, the VE testified that the individual described in the hypothetical question could perform plaintiff's past work as a substitute teacher. However, if plaintiff's

testimony were fully credited, she would be unable to perform any of her past jobs or any other work existing in significant numbers in the economy. The VE was then tendered to plaintiff's counsel but he had no questions to ask of her. (Tr. pp. 374-376).

Following the remand of plaintiff's case by the AC, a second administrative hearing was held on December 20, 2006. Since the time of the first hearing, plaintiff had apparently lost contact with her attorney and the records related to her treatment were still being compiled. Plaintiff's attorney argued that plaintiff's case was a "pain case" and that the results of an MRI performed on January 25, 2006 which demonstrated right nerve root compression related back to the alleged onset date of December 10, 2003. The ALJ, however, pointed out that an August 23, 2005 x-ray of the back was normal but counsel countered that x-rays are ill-suited to detect nerve root involvement and that the x-ray, at any rate, was characterized as being normal in light of plaintiff's age. Counsel further argued that plaintiff's depression was part and parcel of the pain issue. (Tr. pp. 380-385).

After the exhibits were admitted into evidence, plaintiff took the stand and was questioned by the ALJ. After providing much of the same, basic information she had given at the first administrative hearing, plaintiff testified that her pain had worsened in the previous year and was now at a level of "6" to "7",

up from a level of "4" to "5" during 2003 to 2005. As a consequence, plaintiff could no longer engage in routine daily activities as she once had. Medications at the time included Lortab, Soma, and Valium, all prescribed by Dr. Talbot in the fall of 2005, and over the years she had also taken Celebrex and Arthrotec. For the twelve to eighteen months prior to Katrina, plaintiff had seen one Dr. Martinez who ran a pain clinic but he had since possibly lost his license. Through plaintiff's testimony, her counsel learned for the first time that she had been treating with Dr. Talbot and had recently had a counseling session with Dr. Boutte, a psychiatrist from Slidell. (Tr. pp. 386-397).

Upon further questioning by her attorney, plaintiff explained that the home schooling of her youngest daughter as she had alluded to at the first hearing involved nothing more than lying on the couch and being available to answer any questions the child may have as she worked her way through a computer-based tutorial. This was in contrast with plaintiff's previous duties as a substitute teacher which had her on her feet for the majority of the time. Plaintiff had begun seeing Dr. Talbot on a monthly basis for pain management after Dr. Martinez's office failed to re-open. Plaintiff testified that she stopped working secondary to pain to her back and knees which had worsened since December of 2003 such that she could no longer get up from sitting on the floor without

11

assistance. At this time, plaintiff estimated that she could sit for only thirty minutes prior to experiencing pain but then had to stretch her legs out for a couple of hours. Standing could only be accomplished for twenty to thirty minutes before she had to sit down or to find someplace to stretch to relieve the pain. Following this testimony, the ALJ continued the hearing to allow plaintiff's counsel additional time to obtain all of her medical records. (Tr. pp. 397-405).

In due course, the second administrative hearing was reconvened on November 15, 2007. After the ALJ formally admitted into evidence the documents that had been assembled, counsel reported that Dr. Talbot had not, despite repeated requests, updated plaintiff's medical records since January of 2006. For her part, plaintiff advised the ALJ that she had recently had an ultrasound of the left leg which was normal. Plaintiff's attorney then argued that plaintiff's condition satisfied the criteria of Sections 1.02 and 1.04(A) of the Listing of Impairments as evidenced by an x-ray of the right knee demonstrating bone spurs, chronic joint pain and stiffness, a limitation of motion as observed by Dr. Talbot, and difficulties in ambulating per Dr. Cohen. In the alternative, counsel argued that plaintiff was disabled based on the combination of her impairments. On questioning by the ALJ, plaintiff testified that she had seen Dr.

Talbot as recently as one month earlier and even though she duly signed an authorization allowing for the release of her medical records, none were forthcoming. Plaintiff smoked one pack of cigarettes per day, largely spent her time watching TV, and had not looked for work. Her oldest daughter prepared the meals with plaintiff's assistance. Plaintiff had not seen Dr. Boutte again since the second hearing began and Dr. Talbot had sent her out for an ultrasound following complaints of stinging to the back of the knee. Medications were Lortab, Soma, Valium, and Lisinopril. Plaintiff rarely visited friends or family but she was able to shop for groceries. (Tr. pp. 408-422).

When questioned by her attorney, plaintiff testified that her daughter accompanied her to the grocery store to help with the lifting. Occasionally she had to stop and rest and she used a shopping cart for support. Plaintiff could walk one block but would then experience pain and she estimated that she spent eight to ten hours per day lying down to relieve pressure to her back and knees. Plaintiff testified that her back problems started before December of 2003 and that she ultimately quit working in that month due to back pain and muscle spasms. None of her doctors had suggested surgery. (Tr. pp. 422-424, 426).

John Yent, a VE, was the final witness to testify. Like the VE who testified at the first hearing, Yent proceeded to testify to

the exertional and skill demands of plaintiff's past work as a substitute teacher and shuttle bus driver. The ALJ then posed a hypothetical question to Yent which assumed an individual of plaintiff's age, education, and work experience who could lift twenty pounds occasionally, ten pounds frequently; could stand and/or walk for three to four hours per eight hour workday in half-hour increments; could sit at least six hours per eight-hour workday; could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; could occasionally crouch, kneel, stoop, and crawl; and, was to avoid workplace hazards. In answer thereto, the VE testified that the individual described in the hypothetical question would be unable to perform plaintiff's past work. However, the individual could function as a file clerk, receptionist or information clerk, or general office clerk, available positions for which would be reduced by various percentages in light of the given limitations. The VE then altered the initial hypothetical question to include an exertional capacity for only sedentary work. In answer to that question, the VE testified that the file clerk position could still be performed. Through her teaching job, plaintiff had acquired skills that would be transferrable to the clerk-type jobs. (Tr. pp. 424-430).

Upon being tendered to plaintiff's counsel for additional questioning, counsel asked the VE to assume an individual with the

14

profile the ALJ had incorporated into his first hypo who also had a moderate limitation in social functioning. The VE recalled, however, that he had earlier precluded an individual from performing any of plaintiff's past work given the parameters of the first hypothetical. And notwithstanding the possible existence of transferable skills, the VE testified that if an individual had chronic problems with social functioning at a moderate level, the person would be unable to maintain employment. Even with the added non-exertional limitation, the VE testified that the individual could perform a reduced percentage of file clerk or office clerk jobs which involved more limited contact with the public. In response to the ALJ's inquiry, the VE testified that there are no sedentary-level janitorial jobs. Counsel then asked what effect there would be if an individual had to take two one-hour breaks each day due to pain. With that requirement in mind a person would be unable to hold a job. Sedentary jobs typically involve walking 1/3 or less of the time and an inability to walk one hundred yards in a continuous fashion would not necessarily eliminate the previously identified sedentary positions but would turn more on the size of the office in question. (Tr. pp. 430-435).

The documentary evidence generated during the relevant time

period[1]/ begins with a clinic note from Dr. Christian Mayorga dated January 6, 2003 when plaintiff was seen for complaints of a sore throat, right ear pain, and a loss of voice. The assessment included bronchitis and pharyngitis/laryngitis. Medications were dispensed. (Tr. p. 153). Plaintiff's cough persisted by January 13, 2003 but her hypertension and headaches were said to be stable. The assessment on this date included arthritis for which Celebrex was prescribed. (Tr. p. 152). Bloodwork was performed on January 27, 2003 (Tr. pp. 146-149).

On December 12, 2003, plaintiff was evaluated by Dr. Shannon Starr for complaints of an incisional hernia, depression, anxiety, and feelings of worthlessness. Plaintiff reported that she had recently lost her medicaid coverage secondary to an increase in income and could no longer afford Celebrex which had also aggravated her ulcers. She was taking Paxil at the time for her depression and anxiety. On physical examination, plaintiff had a full range of motion to the back with pain upon flexion but no tenderness to palpation. The assessment was depression, arthritis, and an incisional hernia. Plaintiff was given some samples of

_____

[1]/ As a general rule, an ALJ is required to develop the medical history of a SSI claimant for the twelve months prior to the date that the application for benefits was filed. <u>Parker v. Astrue</u>, 2008 WL 544386 at *2 (D. Kan. 2008); <u>Winters v. Barnhart</u>, 2002 WL 1286134 at *10 (D. Kan. 2002).

Zoloft, was encouraged to apply for Pfizer's prescription drug assistance program, and was referred to a surgeon for a hernia consult. (Tr. p. 175). She was not working at this time. (Tr. pp. 235-236). Plaintiff returned to Dr. Starr on December 19, 2003 for follow-up of her depression. She reported improved mood with Zoloft but had begun experiencing headaches and itching to her scalp. Dr. Starr changed plaintiff's medication to Paxil and arranged to have her refills filled for free. Plaintiff had also applied for free refills of Arthrotec to treat her arthritis. (Tr. p. 174).

Plaintiff was seen by Dr. Vincent Morelli on January 21, 2004 for increased pain to her incisional hernia that was newly associated with food intake. She also complained of continued teary episodes and of feeling down and lethargic as well as arthritic pain in the low back and both knees which was effecting her activities of daily living. The diagnosis was depression, arthritis, and an incisional hernia. The dosage of Paxil was adjusted and plaintiff was to start on Arthrotec. (Tr. p. 173). Plaintiff returned for follow-up care one week later and this time was evaluated by Dr. James Campbell. Her depression and arthritis medications were adjusted further and plaintiff was scheduled to see a surgeon at Tulane in connection with her hernia. (Tr. p. 172). Following pre-operative clearance, plaintiff underwent

17

hernia repair at the hands of Dr. Mohammad Suleman on February 6, 2004. Plaintiff tolerated the procedure well and was discharged the following day. (Tr. pp. 183-194).

On February 23, 2004, plaintiff was seen by Dr. Mohamad Sidani for further monitoring of her depression and arthritis. She continued to experience mood swings while on Paxil and she was now having muscle spasms as well. The dosage of Paxil was adjusted again, Flexeril was to be taken for arthritis, and Bextra was to be continued post-surgery. (Tr. p. 225). An Administration psychologist reviewed plaintiff's file on March 2, 2004 and found that she suffered from a non-severe affective disorder which resulted in only a mild limitation on her activities of daily living and in maintaining concentration, persistence, and pace. (Tr. pp. 195-208). The following day, another Administration consultant reviewed plaintiff's file and completed a Physical Residual Functional Capacity Assessment form that elicited information about plaintiff's capabilities. There, the consultant indicated that plaintiff could lift and/or carry twenty pounds occasionally, ten pounds frequently; could stand and/or walk for six hours per eight-hour workday but could sit for less than six hours per eight-hour workday; could push and/or pull with all extremities on an unlimited basis; could frequently climb, balance, stoop, and crouch but only occasionally kneel and crawl; and, who

had no manipulative, visual, communicative, or environmental limitations. (Tr. pp. 209-216). By way of a separate report, the same consultant rendered a vocational assessment of plaintiff, concluding that she was capable of performing her past relevant work as a shuttle bus driver as she had performed it. (Tr. p. 125).

Around this time, plaintiff completed the Administration's Disability Supplemental Interview Outline form, setting forth therein information about her capabilities and daily activities. Plaintiff described an average day as cooking meals, doing housework, and preparing her daughters for lessons with alternating periods of lying on the heating pad throughout the day. Plaintiff was able to drive and go grocery shopping but was not as comfortable being around others as she once used to be. (Tr. pp. 118-123).

On April 29, 2004, plaintiff was seen again by Dr. Sidani for complaints of low back pain since cleaning the bathroom two days earlier. Although most of the doctor's note was rendered illegible in the course of being photocopied, it appears that straight leg raising was positive and there was back pain, muscle spasms, depression, and headaches. Skelaxin was prescribed. (Tr. p. 224). Plaintiff's condition was followed by Dr. Johnny Vasquez on May 1, 2004 and the impression was musculoskeletal pain. (Tr. p. 273). Plaintiff returned to Dr. Morelli for monitoring of her arthritis

and depression on May 11, 2004 and reported no change with her continued low back pain. Straight leg raising was positive with pain but gait was within normal limits. The impression was low back pain and an MRI and a referral to a pain clinic were contemplated. (Tr. p. 223). An MRI of plaintiff's lumbar spine was subsequently performed on May 14, 2004 which revealed degenerative disc disease of L4-5 and L5-S1 with mild posterior bulging at the L5-S1 level. (Tr. p. 182). X-rays taken on that date demonstrated mild disc space narrowing at the lumbosacral level but were otherwise normal. (Tr. p. 222).

On May 18, 2004, plaintiff obtained the recent test results from Dr. Morelli. At that time she described the pain to her lower back as being a "10" on a scale of "1" to "10" with muscle spasms two to three times per week, mostly at night. The only relief she had obtained from her back pain was post-hernia repair when she was taking Vicodin ES and Soma. Trials of Lidoderm and Elavil had failed to produce the desired results. Although plaintiff experienced pain upon straight leg raising, the straight leg raising test itself was negative. The assessment was low back pain and plaintiff was prescribed a course of physical therapy. (Tr. p. 220). That treatment commenced on May 20, 2004 and included therapeutic exercise, manual therapy, ultrasound, electrical stimulation, and moist heat/ice. (Tr. p. 272, 270).

Plaintiff was seen by Dr. Vazquez on May 31, 2004 in connection with her ongoing complaints of back pain but the treatment note from that date is largely illegible. (Tr. p. 271, 177). On June 7, 2004, Dr. Campbell referred plaintiff to a pain clinic in light of her chronic low back pain which was not responding to treatment. (Tr. p. 219). Plaintiff's arthritis and depression were monitored by Dr. Morelli on June 11, 2004 and her back pain remained unchanged. (Tr. p. 285). Continued back pain resulted in a return visit to the Kenner Regional Medical Center ("KRMC") on June 13, 2004 and an administration of Toradol. (Tr. p. 269). The next treatment note was not generated until September 28, 2004 when plaintiff was seen by Dr. Dona Alba for follow-up of her back and shoulder pain. An examination of plaintiff's back revealed no scoliosis or tenderness and the shoulders and knees had a full range of motion with no tenderness, effusion, or rigidity. The assessment was arthritis, glaucoma, and depression. Plaintiff was instructed to continue taking Arthrotec, Flexeril, and Paxil and was referred to physical therapy. (Tr. p. 218).

Approximately nine months passed before plaintiff was next seen by Dr. Sidani on June 28, 2005. Chief complaints at the time were back, knee, and right hand pain, a stuffy nose, and sneezing. Morning stiffness and pain reportedly lasted all day. Since her last doctor's visit, plaintiff had not been x-rayed, had not

engaged in physical therapy, and had not obtained a recommended mammogram. Back, knee, and hand pain were increased with movement and plaintiff "... does not do much activity." On physical examination, plaintiff was described as well-nourished but not well-groomed. Nerves, sensation, and coordination were grossly intact and plaintiff had a full range of motion to all joints but range of back motion was decreased with bilateral tenderness. A small superficial mass was noted on the right wrist. The assessment was polyarthralgia, psoriasis, and a viral upper respiratory tract infection. Physical therapy was ordered again. (Tr. pp. 232, 268). Bloodwork was also performed on June 28, 2005 as were x-rays of plaintiff's shoulder which were normal. (Tr. pp. 233-234). Plaintiff was screened by the physical therapist on July 11, 2005 and was thought to have a fair rehab potential. Functional deficits at the time included mowing the lawn, gardening, general activities of daily living, and sleeping. The plan was for plaintiff to obtain treatment two times per week for eight weeks in the form of therapeutic exercise and activities, manual therapy, ultrasound, electrical stimulation, and moist heat/ice. (Tr. p. 267). Follow-up bloodwork was done on July 13, 2005. (Tr. p. 231).

Plaintiff returned to KRMC's L.S.U. Family Practice Clinic on July 20, 2005, this time being seen by Dr. Thomas Houston.

Plaintiff had not begun physical therapy pending insurance coverage approval. The diagnosis was low back pain and psoriasis. Naprosyn was prescribed and plaintiff was referred to a rhuematologist. (Tr. p. 230). On August 23, 2005, plaintiff was evaluated by Dr. Joseph Biundo who ordered a battery of tests. Medications at the time included Naprosyn which was reportedly not very effective and Paxil. Plaintiff was not sleeping well because of muscle spasms and she was occasionally depressed and tearful over her pain. (Tr. p. 262).

On physical examination, there was some discomfort to the elbow with full extension but no swelling. There was a psoriatric patch associated with the right knee but no swelling. Gait was normal. The impression included low back pain, probable osteoarthritis of the lumbar spine, rule out arthritis to the knee, a psoriatic patch below the right knee, obesity, depression, glaucoma, polyarthralgia, and elevated ANA levels but no clinical findings of lupus. Recommendations included weight loss, decreased cigarette consumption, pelvic tilts and straight leg raises, and prescriptions for Lexapro and Mobic. X-rays of plaintiff's lumbar spine were said to be within normal limits for her age. Similar studies of the knees demonstrated a dorsal superior spur of the right patella with mild fragmentation and mild enthesopathic ossifications at the quadriceps tendon insertions bilaterally. X-

rays of the hip showed minimal degenerative spurring, more prominent on the right, but no evidence of inflammatory arthropathy. (Tr. pp. 255-265).

Plaintiff apparently presented herself to KRMC Emergency Room in the early morning hours of September 1, 2005 for back pain but no contemporaneous treatment records from the attending physician can be found in the administrative record. (Tr. p. 254). On October 26, 2005, plaintiff was evaluated by Dr. Adrian Talbot for pain management. Plaintiff related chronic, progressively worsening back and right knee pain over the previous several years which was described as a constant, dull ache with periods of sharp shooting pain, worse in the morning and with strenuous physical activity. Temporary relief but with no significant improvement was reported with physical therapy. However, the pain was well-controlled with Hydrocodone and Diazepam. On physical examination, plaintiff had mild lumbar paravertebral spasm, was tender to palpation of the lower back, and had pain on straight leg lifts. Curiously, the treatment note from this date contains the results of an MRI that would subsequently be performed on January 25, 2006 which revealed a right paracentral/central extrusion compressing the right S1 nerve root. The assessment was back disorder (not otherwise specified), back spasm, back pain, knee osteoarthritis, knee/lower leg joint pain, depression of mild severity, and a state of anxiety

(not otherwise specified). Plaintiff was prescribed Valium and
Hydrocodone and was to avoid strenuous physical activity. (Tr. pp.
334-336).

On November 9, 2005, plaintiff returned to Dr. Talbot for
monitoring of her condition. Although plaintiff's back and knee
pain was largely unchanged, she did report some improvement with
rest but still had stiffness in the morning and after activities.
Examination of the back was the same as the previous visit. An
exam of the right knee was limited due to pain but effusion was
present and there was a decreased range of motion. The assessment
was unchanged. Plaintiff was given refills for Valium and
Hydrocodone and was started on a trial of Prednisone. (Tr. p. 331-
333).

Plaintiff reported relief to her stiffness with the Prednisone
when she was next seen by Dr. Talbot on November 23, 2005. The
results of a physical examination were the same as was the doctor's
assessment. Prednisone was to be discontinued due to an apparent
recent diagnosis of glaucoma but plaintiff was given refills for
Valium and Hydrocodone. (Tr. pp. 329-330). On that same day
plaintiff was also seen by Dr. Biundo. The doctor remarked that
plaintiff seemed to be a little better and plaintiff herself
reported that she could engage in more activities and could clean
her house. Plaintiff was instructed on the proper performance of

pelvic tilt exercises. The assessment was low back pain with normal plain x-rays, minimal osteoarthritis of the knees, obesity, depression, glaucoma, and no evidence of lupus following a false positive ANA. Plaintiff was instructed to perform pelvic tilt and straight leg raising exercises, to increase activity, and to discontinue smoking. (Tr. pp. 278-279).

Plaintiff's condition was essentially unchanged when she returned to Dr. Talbot on January 4, 2006 and she was again given refills on her Valium and Hydrocodone and was to avoid strenuous physical activity. (Tr. pp. 327-328). She was next seen by Dr. Campbell on January 12, 2006 who noted positive straight leg raising at 45°. The diagnosis was chronic low back pain. (Tr. p. 277). Plaintiff presented to the KRMC Emergency Room on January 15, 2006 complaining of right lower quadrant abdominal pain since the previous evening with vomiting that morning. CT scans of the pelvis and abdomen failed to produce any significant findings. Following the administration of Toradol, Phenergan, and Levsin, plaintiff's condition quickly improved and she was discharged home. (Tr. pp. 240-254). Plaintiff was apparently seen again at KRMC on January 17, 2006 for complaints of low back pain but no diagnosis or treatment plan appears on the hospital's registration record. (Tr. p. 239).

On January 18, 2006, plaintiff returned to Dr. Talbot for

continued pain management. Plaintiff reported increased pain due to post-Katrina clean-up activities and Valium was no longer helping with her spasms. The physical exam and test results were the same as previous occasions and plaintiff was given a refill on her Hydrocodone and was to go on a trial of Carisoprodol in place of Valium. (Tr. pp. 325-326). The MRI of plaintiff's lumbar spine which was mentioned in Dr. Talbot's earlier treatment notes was finally conducted on January 25, 2006. That testing revealed a right paracentral/central extrusion compressing the right S1 nerve root but no significant spinal stenosis, neural foraminal narrowing, fractures, dislocations, or subluxations. (Tr. pp. 237-238). Plaintiff was next seen by Dr. Talbot on February 15, 2006 and she reported that Carisoprodol helped with her pain and spasms. Once again, the remainder of the doctor's treatment note was the same as that generated at the previous office visit. Refills of plaintiff's medications were dispensed and she was again advised to avoid strenuous physical activity. (Tr. p. 322-323). Except for the blood pressure reading and a February 15th notation to "[c]ontinue Carisoprodol", Dr. Talbot's next treatment note from March 15, 2006 is identical to the one he authored on February 15, 2006. (Tr. pp. 320-321).

By the time of plaintiff's next periodic evaluation by Dr. Talbot on April 12, 2006, a mental health evaluation had been

scheduled for May 18, 2006. Plaintiff reported suffering from insomnia at the time. Physical examination findings were the same as previous occasions and plaintiff was prescribed Valium for her insomnia in addition to being given refills for Hydrocodone and Carisoprodol. (Tr. pp. 318-319). Plaintiff advised on May 10, 2006 that Valium was helping her insomnia but she did complain of increased pain and stiffness. Insomnia was added to the list of conditions in plaintiff's diagnosis and she was given additional refills of Valium, Hydrocodone, and Carisoprodol. (Tr. pp. 316-317).

On May 18, 2006, plaintiff received a psychological pain evaluation by Dr. John Boutte, a licensed clinical psychologist. Chronic lower back, knee, and foot pain were the presenting problems. Clinical findings were mild depression and a low risk of substance abuse or dependence. The diagnosis was pain disorder with psychological factors due to chronic pain with a low risk for substance abuse. Plaintiff was advised to continue her treatment with Dr. Talbot and to return in six months. (Tr. pp. 314-315). Plaintiff had no new complaints when she returned to Dr. Talbot on June 7, 2006. The rest of the treatment note from this date is nearly identical to those from previous dates except that plaintiff was instructed on back strengthening exercises. Prescription refills were issued. (Tr. pp. 312-313). Plaintiff reported

increased pain on July 5, 2006, having run out of her prescription medications two days earlier. Refills were given on her medications including an increased supply of Hydrocodone. (Tr. pp. 310-311). Despite that increase, when plaintiff returned to Dr. Talbot on August 2, 2006, she indicated that she had run out of her medications one day earlier and was thus experiencing an increase in pain. More medications were dispensed. (Tr. pp. 308-309).

Plaintiff was seen again by Dr. Talbot on August 30, 2006 and reported good pain control after the frequency of Hydrocodone was increased but with continued morning stiffness. The supply of Hydrocodone was increased even more and plaintiff was additionally given a trial of Naproxen in addition to refills for Valium and Carisoprodol. (Tr. pp. 306-307). A decrease in morning stiffness with the use of Naproxen was noted on September 27, 2006 and more refills for the prescription drugs were given. (Tr. pp. 304-305). Plaintiff was granted more refills on October 25, 2006. (Tr. pp. 302-303). She complained of increased pain and morning stiffness with colder temperatures on November 20, 2006 and the quantity of Hydrocodone was increased even further. (Tr. pp. 300-301). Plaintiff advised Dr. Talbot of good pain control on December 18, 2006 and more refills on her four prescription drugs were issued. (Tr. pp. 298-298). The final treatment note from Dr. Talbot documents plaintiff's return on January 15, 2007 at which time

additional refills were given as well as a trial of Piroxicam. (Tr. pp. 296-297).

On February 14, 2007, plaintiff underwent a consultative psychiatric evaluation by Dr. Alvin Cohen. Plaintiff drove herself to the evaluation and was observed to walk carefully and slowly. Plaintiff reported having taken Paxil several years earlier and she presently took four to five Lortabs and Somas daily in addition to Valium. Plaintiff complained of some crying spells, feelings of depression and worthlessness, and a loss of self-esteem. She expressed anxiety over the uncertainty of the future and was unable to relax, causing fatigue and the need to take a nap during the day. Plaintiff's daily activities included few household chores but she was able to grocery shop with her children's assistance. Both of plaintiff's dependent children were special education students and plaintiff was home-schooling the younger one as she was unable to get along with fellow students. The bulk of plaintiff's time was spent lying on a heating pad and watching TV. Plaintiff socialized with family members during the holidays but had few other friends.

On mental status examination, plaintiff had a depressed mood, a feeling of emptiness, and some anxiety. Affect was full-range; memory, intelligence, concentration, and attention were adequate; and, there was no evidence of delusions or hallucinations. Social

functioning was limited but the limitations in plaintiff's daily activities were primarily due to her physical problems. The diagnosis was major depressive disorder, dependent personality disorder, degenerative discs by history, and few intimate relationships. The prognosis was guarded and plaintiff was thought to benefit from psychiatric treatment but was competent to manage her own funds. (Tr. pp. 344-346).

As part of his evaluation, Dr. Cohen also completed the Administration's standardized form denominated "Medical Source Statement of Ability to do Work-Related Activities (Mental)". There, Dr. Cohen indicated that plaintiff had no limitations in the ability to understand, remember, or carry out instructions or to respond appropriately to supervision, co-workers, or the pressures of the workplace. However, pain made it difficult for plaintiff to perform routine chores. (Tr. pp. 347-350).

Plaintiff challenges the Commissioner's decision to deny SSI benefits on two grounds. First, plaintiff alleges that the ALJ violated 20 C.F.R. §416.1477 by failing to comply with the remand instructions of the AC. (Rec. doc. 12-6, pp. 5-10).

Initially, the Court questions whether it even has jurisdiction to consider plaintiff's first challenge to the Commissioner's decision. Title 42 U.S.C. §405(g), which is incorporated into 42 U.S.C. §1383(c)(3) by reference, vests federal

courts with jurisdiction only over civil actions contesting a "...
final decision of the Commissioner after a hearing ...". Under 42
U.S.C. §405(h), the right to juridical review created by §405(g) is
conditioned upon compliance with the procedures set forth in the
Social Security Act, namely, proper and timely exhaustion of
administrative remedies. Social Security regulations provide for
a multi-step process through which administrative remedies must be
exhausted as a condition precedent to filing suit under §405(g),
the last step being review by the AC. 42 U.S.C. §416.1500(a)(1) to
(4). Only after those steps have been completed will the
Administration be said to have made its "final decision", thus
allowing an aggrieved claimant to "... request judicial review by
filing an action in a Federal district court." 20 C.F.R.
§416.1400(a)(5).

When a claimant's case is before the AC during the exhaustion
process, the regulations allow that tribunal to remand the case to
the ALJ to hold a hearing and to issue a decision or recommended
decision, to receive additional evidence, or to take additional
action. 20 C.F.R. §416.1477(a). In such instances, the regulations
further provide that "[t]he administrative law judge shall take any
action that is ordered by the Appeals Council and may take any
additional action that is not inconsistent with the Appeal
Council's remand order." 20 C.F.R. §416.1477(b). "However,

"[w]hether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision." Brown v. Comm. of Social Security, 2009 WL 465708 at *6 (W.D. Mich. Feb. 24, 2009).

In the present case, subsequent to the issuance of the ALJ's decision on December 14, 2007, plaintiff requested review of that decision by the AC, specifically arguing that the latter tribunal's remand order of July 7, 2006 had not been complied with. (Tr. pp. 353-354). By denying plaintiff's request for review the AC implicitly found that its earlier remand order had been followed. See, e.g., Bass v. Astrue, 2008 WL 3413299 at *4 n. 2 (M.D.N.C. Aug. 8, 2008). Section 405(g) does not provide a federal court with authority to review intermediate agency decisions that occur during the administrative review process. Brown, 2009 WL 465708 at *6 (citing Bass, 2008 WL 3413299 at *4).

Jurisdictional concerns notwithstanding, a review of the AC's remand order and the ALJ's decision of December 14, 2007 readily establishes that the former mandate was sufficiently complied with. On July 7, 2006, the AC remanded plaintiff's case back to the ALJ for resolution of the following issues:

> [t]he Administrative Law Judge found in finding number two that the claimant suffers from severe musculoskeletal back pain. The medical evidence also shows that the claimant is obese. The most recent medical evidence dated January 12, 2006 (exhibit 8F) reveals that the

claimant is five feet-two inches tall and 197 pounds.
This would result in a body mass index (BMI) of 36.
Social Security Ruling 02-1p requires that the severity
of the claimant's obesity be considered and any
limitations be discussed.

The Administrative Law Judge indicated in finding number
six that the claimant retained the ability to perform her
past work as a substitute teacher, based on the residual
functional capacity for a reduced range of light work.
The claimant's "Work History Report" dated March 5, 2004
shows that this job was performed between 1999 and 2003
and the claimant's wages posted for this period is below
what is usually considered substantial gainful
employment. Further evaluation is needed to determine
whether the claimant's past work was performed at the
substantial gainful activity level and if not proceed to
the next step in the sequential evaluation process.

                                        (Tr. p. 44).

To facilitate a resolution of those two issues, the AC
directed the ALJ to do the following:

[o]btain additional evidence concerning the claimant's
physical impairments, including obesity, in order to
complete the administrative record in accordance with the
regulatory standards regarding consultative examinations
and existing medical evidence (20 CFR 416.912-913). The
additional evidence may include, if warranted and
available, a consultative internist and/or orthopedic
examination and medical source statements about what the
claimant can still do despite the impairments.

Give further consideration to the claimant's maximum
residual functional capacity and provide appropriate
rationale with specific references to evidence of record
in support of the assessed limitations (20 CFR 416.945
and Social Security Ruling 96-8p).

If warranted, obtain supplemental evidence from a
vocational expert to clarify the effect of the assessed
limitations on the claimant's occupational base (Social

Security Ruling 83-14, and *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.  The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966).  Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Tr. p. 45).

The AC's remand order thus directed the ALJ to: 1) obtain additional evidence about plaintiff's physical impairments, including obesity, 2) give further consideration to her residual functional capacity ("RFC"), and 3) if warranted, obtain supplemental evidence from a VE to clarify the effect of plaintiff's limitations on the available occupational base. Consistent with the remand, the ALJ scheduled a second administrative hearing for December 20, 2006 and received additional documentary evidence in the form of an August 23, 2005 x-ray of plaintiff's lumbar spine and numerous treatment records from KRMC which were ultimately admitted as exhibit 9F.  At the start of that hearing, it became apparent that plaintiff had lost contact with her attorney since the time of the first hearing on January 19, 2006 as counsel learned for the first time that

plaintiff had treated with Doctors Martinez, Talbot, and Boutte. Accordingly, the ALJ continued the hearing until November 15, 2007, a period of eleven months, to afford counsel more time to obtain those additional medical records.

By the time the hearing was reconvened, the ALJ had obtained additional treatment records from Doctors Talbot and Boutte, had sent plaintiff for a consultative evaluation by Dr. Cohen, and had provided counsel with a copy of Dr. Cohen's report. Despite counsel's numerous requests and plaintiff's execution of a release during the course of an evaluation just one month earlier, Dr. Talbot had still not provided the entirety of plaintiff's treatment records. The ALJ was skeptical that the doctor would ever be forthcoming with the records but he invited counsel to continue his efforts in that regard and to submit whatever documentary evidence he could obtain before and even after the ALJ had issued his written decision. (Tr. pp. 411, 434). In keeping with the order of remand, the ALJ ultimately received and considered additional evidence about plaintiff's physical impairments including the results of the MRI performed on January 25, 2006 and records from some twelve office visits plaintiff had with Dr. Talbot. In addition, the ALJ considered the psychological pain evaluation from Dr. Boutte and the results of the psychiatric consultative evaluation conducted by Dr. Cohen.

As respects plaintiff's alleged obesity, the Court first notes
that no such condition was identified as disabling in the
Disability Report accompanying her application for SSI benefits.
See Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989). At the
first administrative hearing that was held on January 19, 2006,
plaintiff testified that she had gained forty pounds in the
previous six months. A review of the record, however, does not
bear this out as plaintiff's weight was recorded as one hundred
eighty pounds on both January 18, 2006 and June 28, 2005. (Tr. pp.
325, 232). Nevertheless, the ALJ did, in fact, consider
plaintiff's obesity in assessing her RFC, as follows:

> [c]onsideration has to be given to the concept of obesity
> as it is a medically determinable impairment that is
> often associated with disturbances of the musculoskeletal
> system, and disturbances of this system can be a major
> cause of disability in individuals with obesity. The
> combined effects of obesity with musculoskeletal
> impairments can be greater than the effects of each of
> the impairments considered separately. Therefore, the
> undersigned has considered any additional and cumulative
> effects of obesity, and found that the claimant's overall
> functioning is further impaired by this condition.

(Tr. p. 22).

Plaintiff argues that the ALJ erred in failing to find that
her obesity itself was a severe impairment. Given the fact that
plaintiff's application for SSI benefits was not summarily denied
at the second step of the §416.920 analysis, no prejudice is shown.
Following the remand, the ALJ reassessed plaintiff's RFC as

involving a diminished ability to stand and/or walk, presumably in recognition of the limitations caused by her obesity, thus satisfying the second aspect of the AC's directive. And although the third aspect of the remand order entrusted the ALJ with the ultimate decision of whether to obtain it or not, the ALJ did receive supplemental testimony from a VE to clarify the effect of plaintiff's limitations on the available occupational base.

Plaintiff additionally complains that the ALJ failed to recontact her treating physician in violation of 20 C.F.R. §416.912(e)(1). Yet plaintiff does not identify which one of her numerous treating physicians the ALJ should have recontacted. Given the fact that the record does contain medical evidence from numerous doctors based on personal examination and treatment of plaintiff, the ALJ was relieved of the obligation of recontacting any one of those practitioners. <u>Newton v. Apfel</u>, 209 F.3d 448, 453 (5th Cir. 2000)(quoting <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir. 1994), <u>overruled in part on other grounds by Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080 (2000)); <u>Williams v. Astrue</u>, 2088 WL 2397702 at *10 (E.D. La. June 11, 2008).

Finally, plaintiff alleges that the ALJ erred by failing to order a consultative evaluation under 20 C.F.R. §416.912(f). Once again, plaintiff does not identify with specificity the evaluation she believes should have been conducted. Reversal of the

Commissioner's decision for a violation of §416.912 is appropriate only if the claimant shows prejudice from the ALJ's failure to request additional information. <u>Newton</u>, 209 F.3d at 458. <u>See also</u> <u>Fink v. Barnhart</u>, 123 Fed. Appx. 146, 148 (5th Cir. 2005). "'Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different conclusion.'" <u>Id</u>. (quoting <u>Ripley v. Chater</u>, 67 F.3d 552, 557 n. 22 (5th Cir. 1995). As no such showing is made here, this claim is rejected.

Plaintiff's second challenge to the Commissioner's decision is that the ALJ erred in failing to find that plaintiff's condition met or equaled the criteria set forth in Section 1.04(A) of the Listing of Impairments. That section provides that a claimant will be deemed to be disabled if she suffers from:

> 1.04 *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The burden is upon the plaintiff to prove up all of the

criteria of a particular listing, <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990), and to provide medical findings that support all of the criteria under an equivalence analysis. <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990).

In support of her second challenge, plaintiff relies upon the results of an MRI performed on May 14, 2004 which revealed degenerative disc disease at L4-5 and L5-S1; the results of a second MRI conducted on January 25, 2006 which demonstrated a right paracentral/central extrusion compressing the right S1 nerve root; and, whole groups of medical records which supposedly establish neuro-anatomic distribution of pain, limitation of motion of the spine, and positive straight leg raising. (Rec. doc. 12-6, p. 11).

Some of the medical records cited by plaintiff actually detract from rather than support her position. For example, on December 12, 2003 it was reported that plaintiff had a full range of motion to the back with no tenderness to palpation; no physical examination findings are reported in the range of exhibits from page 182 through page 194; a straight leg raising test was negative on May 18, 2004; and, Dr. Talbot consistently reported no obvious deformity of the back and with only mild lumbar paravertebral tenderness and spasm and 2+ deep tendon reflexes on numerous occasions between October 26, 2005 and January 15, 2007. Dr. Talbot only restricted plaintiff from strenuous physical activity,

not all work-related activities.  In any event, absent are any references to evidence of "...motor loss (atrophy associated with muscle weakness or muscle weakness) accompanied by sensory or reflex loss..." as Section 1.04(A) requires.  Without proof of every element of a particular listing, plaintiff's argument fails.

### **RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's cross-motion for summary judgment be denied and that defendant's cross-motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this _4th_ day of __August__, 2009.


_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

41